No. 23-1890

---

## In the United States Court of Appeals for the Eighth Circuit

---

**United States of America,**

Appellee

v.

**Joe David May,**

Appellant

---

On Appeal from the United States District Court
for the Eastern District of Arkansas

Honorable Kristine G. Baker

---

## Appellant's Reply Brief

---

Brett D. Watson
Brett D. Watson, Attorney at Law, PLLC
P.O. Box 707
Searcy, Arkansas 72145-0707
(501) 281-2468
watson@bdwpllc.com
Ark. Bar No. 2002182

# Table of Contents

Table of Authorities ............................................................. iv

Reply Argument .................................................................. 1

   I.  The district court abused its discretion by allowing
      the introduction of e-mails via Lackey's certification ........... 1
      A.  The certification did not properly authenticate
          the e-mails ........................................................... 1
      B.  The certification did not satisfy the requirements of
          FRE 803(6) for the business-records
          hearsay exception ............................................... 6
      C.  The certification and e-mails violated May's rights
          under the Confrontation Clause ....................... 7

   II.  The district court abused its discretion by allowing
      the introduction of e-mails via Cialone's certification .......... 8
      A.  The certification did not properly authenticate
          the e-mails ........................................................... 8
      B.  The certification did not satisfy the requirements of
          FRE 803(6) for the business-records
          hearsay exception ............................................... 9
      C.  The certification and e-mails violated May's rights
          under the Confrontation Clause ....................... 9

   III. The district court abused its discretion by allowing
      the introduction of spreadsheets via
      O'Neill's affidavit .................................................. 10
      A.  The affidavit did not properly authenticate
          the spreadsheets ............................................. 10
      B.  The affidavit did not satisfy the requirements of
          FRE 803(6) for the business-records
          hearsay exception ............................................. 11

Appellate Case: 23-1890    Page: 2    Date Filed: 04/09/2024   Entry ID: 5381482

    C.  The affidavit and spreadsheets violated May's rights under the Confrontation Clause ...................................... 13

IV.  Because Government Exhibits 1, 2, and 3A thru 3J were based on Government Exhibits 4 and 5, they were also improperly introduced ......................................... 15

V.  The district court abused its discretion by not allowing May to cross-examine Clifton about his dishonesty .......... 16

VI.  The evidence was insufficient to convict May of conspiracy ................................................................. 17

VII.  The evidence was insufficient to convict May of mail fraud as to Holiman ...................................... 20

VIII.  The evidence was insufficient convict May of receiving kickbacks ............................................... 25

IX.  The district court abused its discretion by not giving a good-faith instruction ...................................... 27

X.  The district court abused its discretion by not giving May's proposed intent-or-knowledge instruction ......... 29

XI.  The district court abused its discretion by allowing the government to shift the burden in closing ............... 30

XII.  The evidence was insufficient to convict May of aggravated identity theft ...................................... 32

Conclusion ........................................................................ 37

Certificate of Service ........................................................ 39

Certificate of Compliance ................................................ 40

Appellate Case: 23-1890    Page: 3    Date Filed: 04/09/2024 Entry ID: 5381482

# Table of Authorities

## Cases

*Branch v. Gov't Emples. Ins. Co.*,
  286 F. Supp. 3d 771 (E.D. Va. 2017) ...................................................... 4

*Dubin v. United States*,
  143 S. Ct. 1557 (2023) ............................................................................. 32

*Phoenix Assocs. III v. Stone*,
  60 F.3d 95 (2d Cir. 1995) .......................................................................... 3

*Ruan v. United States*,
  142 S. Ct. 2370 (2022) ............................................................................. 28

*Smith v. United States*,
  930 F.3d 978 (8th Cir. 2019) ................................................................... 36

*United States v. Asomani*,
  7 F.4th 749 (8th Cir. 2021) ...................................................................... 28

*United States v. Brown*,
  478 F.3d 926 (8th Cir. 2007) ................................................................... 28

*United States v. Casperson*,
  773 F.2d 216 (8th Cir. 1985) ................................................................... 27

*United States v. Chatmon*,
  742 F.3d 350 (8th Cir. 2014) ................................................................... 19

*United States v. Clotaire*,
  963 F.3d 1288 (11th Cir. 2020) ............................................................... 13

*United States v. Cone*,
  714 F.3d 197 (4th Cir. 2013) ..................................................................... 7

Appellate Case: 23-1890     Page: 4     Date Filed: 04/09/2024 Entry ID: 5381482

*United States v. Daneshvar,*
   925 F.3d 766 (6th Cir. 2019) ...................................................... 7

*United States v. Davis,*
   867 F.3d 1021 (8th Cir. 2017) .................................................. 19

*United States v. Dennis,*
   81 F.4th 764 (8th Cir. 2023) ..................................................... 36

*United States v. Dennis,*
   625 F.2d 782 (8th Cir. 1980) .................................................... 17

*United States v. Franco,*
   874 F.2d 1136 (7th Cir. 1989) ................................................... 4

*United States v. Gaona-Lopez,*
   408 F.3d 500 (8th Cir. 2005) ................................................... 16

*United States v. Gladden,*
   78 F.4th 1232 (11th Cir. 2023) ......................................... 33, 34

*United States v. Hathaway,*
   798 F.2d 902 (6th Cir. 1986) .................................................... 5

*United States v. Heatherly,*
   985 F.3d 254 (3d Cir. 2021) ..................................................... 2

*United States v. Keck,*
   643 F.3d 789 (10th Cir. 2011) ................................................. 13

*United States v. Melgen,*
   967 F.3d 1250 (11th Cir. 2020) ............................................... 14

*United States v. Melton,*
   870 F.3d 830 (8th Cir. 2017) .................................................. 12

Appellate Case: 23-1890    Page: 5    Date Filed: 04/09/2024 Entry ID: 5381482

*United States v. O'Lear*,
   90 F.4th 519 (6th Cir. 2024) ........................................................35

*United States v. Pelullo*,
   964 F.2d 193 (3d Cir. 1992) ...........................................................4

*United States v. Rainbow*,
   813 F.3d 1097 (8th Cir. 2016) ................................................. 11, 13

*United States v. Ray*,
   930 F.2d 1368 (9th Cir. 1990) .........................................................4

*United States v. Ramer*,
   883 F.3d 659 (6th Cir. 2018) ...........................................................3

## Statutes, Rules, and Constitutions

18 U.S.C. § 1028A .................................................................... 32, 36

18 U.S.C. § 1341 ...........................................................................29

18 U.S.C. § 1343 ...........................................................................29

21 U.S.C. § 841 .............................................................................29

FRE 403 .......................................................................................17

FRE 608 .......................................................................................17

FRE 801 .........................................................................................7

FRE 802 .......................................................................................15

Appellate Case: 23-1890     Page: 6     Date Filed: 04/09/2024 Entry ID: 5381482

FRE 803 ............................................................................................ 6, 9, 11

FRE 901 ................................................................................................... 6

FRE 902 .................................................................................... 1, 5, 6, 9, 10

FRE 1006 ................................................................................................ 14

Appellate Case: 23-1890    Page: 7    Date Filed: 04/09/2024 Entry ID: 5381482

<h1 align="center">Reply Argument</h1>

## I. The district court abused its discretion by allowing the introduction of e-mails via Lackey's certification.

### A. The certification did not properly authenticate the e-mails.

The hurdle for authentication is low only in the sense that the Federal Rules of Evidence make it low. It does not mean the Court ignores the text of the rules. Federal Rule of Evidence 902(11) requires a certification of "the custodian or another qualified person." The question, then, is whether persons are "qualified" to authenticate e-mails for no reason other than they are former employees. We explain in our opening brief they are not.

And being a former employee is the *only* qualification Lackey gives for authentication. Here's the entire certification:

I, Missy Lackey, being duly sworn state:

1. I was formerly employed by MedwoRx Compounding LLC ("MedwoRx"), which is no longer in business.

1

2. I hereby certify the attached CD contains copies of e-mails (and e-mail attachments) retained by MedwoRx during my tenure at the company.

3. I further certify these e-mails (and e-mail attachments) were created at or near the time of the events they describe by (or from information transmitted by) persons with knowledge.

4. I further certify these e-mails (and e-mail attachments) were kept in the course of a regularly conducted business activity by MedwoRx.

5. I further certify that it was the regular practice of MedwoRx to make and retain these e-mails (and e-mail attachments).

Add. 17. Thus, the sole qualification Lackey gives is that she was a former employee. She does not say how or why she is familiar with MedwoRx's e-mail system or retention policy or how she came to possess e-mails of a company that no longer exists.

None of the cases the government cites authenticate on such a slender thread:

- A custodian of records, *United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021);

2

- An enforcement branch manager for a state agency who authenticated bank records by showing familiarity with bank recordkeeping systems, described the recordkeeping process, explained the painstaking process by which she examined the records, repeatedly drafted and issued subpoenas for the records, identified accounts, and repeated the process until she understood the records. *United States v. Ramer*, 883 F.3d 659, 678 (6th Cir. 2018);

- A company's CFO/accountant who authenticated wire-transfer records by testifying that the records were completed regularly by the accounting department when receiving or issuing wire transfers, *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995);

- A welfare-fraud investigator who, testifying about documents in the defendant's welfare file, explained her familiarity with the filing and reporting requirements for public assistance and the forms used in connection

with those requirements, *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990);

- A narcotics agent who authenticated the business record of a money exchange by detailing the manner in which the records were prepared and maintained, *United States v. Franco*, 874 F.2d 1136, 1139–40 (7th Cir. 1989); and

- An individual who, as an insurer's employee, had access to data another company stored for the insurer, showed that she had direct personal knowledge of the type of data on the database, how it was stored, and how it could be accessed, and explained the information in each spreadsheet field and how the information originally entered into the other company's system, *Branch v. Gov't Emples. Ins. Co.*, 286 F. Supp. 3d 771, 778 (E.D. Va. 2017).[1]

---

[1] In another case the government cites, the court rejected rather than approved the government's attempt to introduce evidence without a proper foundation. *United States v. Pelullo*, 964 F.2d 193,

Appellate Case: 23-1890    Page: 11    Date Filed: 04/09/2024 Entry ID: 5381482

Unlike all those cases, Lackey's certification does not show that she was qualified to authenticate the e-mails. And although the district court said that Lackey "was an adjudication specialist for prescriptions while working at MedwoRx and that the emails she serves as the custodian for are emails she herself received during her MedwoRx employment," that was based on the government's representation, not Lackey's. R. Doc. 210, at 2. Further, Lackey did not claim, as the district court found, to be custodian of the e-mails.

The government cites no case (nor have we found one) where such a weak certification under Rule 902(11) has been considered. Which is perhaps why, as the government notes, it can find no case where improper certification under Rule 902(11) was reversible error. Appellee's Br. at 32.

---

201–02 (3d Cir. 1992). And in another, the basis for finding the person qualified was unclear, since the only issue was whether someone outside an organization could authenticate the organization's records. *United States v. Hathaway*, 798 F.2d 902, 906 (6th Cir. 1986).

Appellate Case: 23-1890     Page: 12     Date Filed: 04/09/2024 Entry ID: 5381482

The government is incorrect that the insufficient certification is harmless because Hudson, "a live witness[,] authenticated the records under Rules 901(b)(1) and (b)(4)." *Id.* at 33. Hudson did not authenticate the Lackey exhibits. (Government Exhs. 245-281, 284-295, and 298-304). The pages the government cites show that he testified about other exhibits. (TR., Vol. 2, p. 222–26). And when he was asked about the Lackey exhibits, all he did was look at the e-mails and say that they looked like e-mails from and to Lackey. *Id.* at 225–26. It didn't take a qualified person to say that; it only took someone who could read.

## B. The certification did not satisfy the requirements of FRE 803(6) for the business-records hearsay exception.

Lackey's certificate did not comply with the business-records exception either. A requirement is that the conditions for the exception be shown by the records custodian, by another qualified witness, or by a certification that complies with Federal Rule of Evidence 902(11) or (12). Lackey does not claim to be the custodian, her certification does not satisfy Rule 902(11), and Rule

902(12) concerns foreign records, inapplicable here. That leaves whether Lackey is "another qualified witness." She did not testify, so she was not a witness, and, as we have shown, she was not qualified. Therefore, the e-mails do not come within the business-records exception.

Here's another reason they don not fall within the exception: it contains the type of conclusory language that cases we cite in our opening brief have found insufficient. *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019); *United States v. Cone*, 714 F.3d 197, 219–20 (4th Cir. 2013).

The government also claims that the e-mails contained co-conspirator statements and that, as a result, they are admissible under Rules 801(d)(2)(A) and (d)(2)(E). This new argument is unavailing. They still have to get past Lackey's first-level hearsay. As we have shown, they did not.

## C.  The certification and e-mails violated May's rights guaranteed under the Confrontation Clause.

The government proffers various reasons why, in its view, May's Confrontation Clause rights were not violated by Lackey's certifica-

tion and e-mails. We preemptively addressed those reasons in our opening brief and do not repeat them here.

## II. The district court abused its discretion by allowing the introduction of e-mails via Cialone's certification.

The legal principles as to Cialone are the same as to Lackey. We thus adopt and incorporate the statements of what the law is as to authentication, hearsay, and the Confrontation Clause. We limit our discussion of Cialone to applying the law to the facts.

### A. The certification did not properly authenticate the e-mails.

For the reasons the Lackey certification fails to show that she is qualified, so, too, does the Cialone certification fail to show that she is qualified. And as with Lackey, the government tries to overcome this deficiency by saying that Hudson read the e-mails at trial and told the jury what they said. Appellee's Br. at 34 (citing TR., Vol. 2, p. 260–61). For the same reason that argument fails as to Lackey, it fails as to Cialone.

8

## B. The certification did not satisfy the requirements of FRE 803(6) for the business-records hearsay exception.

The same arguments that apply to Lackey apply to Cialone. In addition, the government says that certain statements in the Cialone e-mails were offered for their effect on the recipient rather than for the truth of the matter asserted. Even so, that does not get past Rule 902(11) certification. Moreover, the government contends that Cialone's e-mails "would nonetheless have been admissible on the same limited terms as the patient complaints she paraphrased." Appellee's Br. at 37. The key words: "would … have been." That is not the purpose for which the government introduced them.

## C. The certification and e-mails violated May's rights guaranteed under the Confrontation Clause.

The government proffers various reasons why, in its view, May's Confrontation Clause rights were not violated by the Cialone certification and e-mails. We preemptively addressed those reasons in our opening brief and do not repeat them here.

## III. The district court abused its discretion by allowing the introduction of spreadsheets via O'Neill's affidavit.

The legal principles as to O'Neill are the same as to Lackey. We thus adopt and incorporate the statements of what the law is as to authentication, hearsay, and the Confrontation Clause. We limit our discussion of O'Neill to applying the law to the facts.

### A. The affidavit did not properly authenticate the spreadsheets.

We explained in our opening brief why O'Neill's affidavit did not comply with Rule 902(11) or (13) and do not repeat that argument here. The government, however, claims that Wunderlin authenticated the spreadsheets even if O'Neill did not. But Wunderlin expressed no independent basis for knowing that the spreadsheets (Government Exhibits 4 and 5) were what they purported to be or that they were accurate. He testified only that Government Exhibits 1 and 2 accurately summarized the data in Government Exhibit 4 and that Government Exhibits 3A thru 3J accurately summarized date in Government Exhibits 4 and 5.

10

(TR., Vol. 3, p. 482, 484, 487). He did not and could not testify that the data in Government Exhibits 4 and 5 were accurate.

The government theorizes that because May's counsel did not cross-examine Wunderlin about the validity and accuracy of the underlying data, it shows there was no real dispute about it. Not true. May's counsel repeatedly objected to its introduction. Once the district court improperly allowed the evidence, May had no duty to rehabilitate the improperly admitted exhibits.

## B. The affidavit did not satisfy the requirements of FRE 803(6) for the business-records hearsay exception.

We do not take issue with the fact that insurer and pharmacy data is admissible in prosecutions. We take issue with the admission of such data in violation of the Rules of Evidence. Unlike the certificate in *United States v. Rainbow*, which the government cites, O'Neill's affidavit and spreadsheet do not indicate that she regularly prepares such reports in the administration of her work such that "an objective witness would not necessarily know that

11

the [affidavit or spreadsheets] would be used at a later trial." 813 F.3d 1097, 1104 (8th Cir. 2016).

O'Neill's spreadsheet is more like the inadmissible report in *United States v. Melton*, 870 F.3d 830 (8th Cir. 2017). The report there was based on existing data: credit-card charges, expense reimbursements, payments made, and payroll-tax information. *Id.* at 840. The report did not fall within the business-records exception, because "it was created for the purpose of determining the legal implications of [the defendant's] conduct." *Id.* Likewise, O'Neill's spreadsheet, though purportedly created from existing data, was created for the purpose of determining its legal implications. And although the Court in *Melton* did not reverse because the data was cumulative, that is not so here. To the contrary, the spreadsheets formed the foundation for other exhibits, making them inadmissible as well.

The government's attempt to distinguish *Melton* falls short. Appellee's Br. at 44 n.25. The data on which the *Melton* report relied was not created after the crime; it existed before the crime.

Appellate Case: 23-1890     Page: 19     Date Filed: 04/09/2024 Entry ID: 5381482

Likewise, the government's labeling the spreadsheet as merely an adapted format fails. In one case the government cites, the business records were still frames from a video taken in the ordinary course of business. *United States v. Clotaire*, 963 F.3d 1288, 1293–94 (11th Cir. 2020). That's far different from taking preexisting numbers and creating a new document. Similarly, in another case the government cites, the defendant agreed that the original, computer-generated spreadsheets were business records. *United States v. Keck*, 643 F.3d 789, 797 (10th Cir. 2011). Here, however, O'Neill's affidavit does not indicate that spreadsheets were computer-generated, and May did not agree that they were.

**C. The affidavit and spreadsheets violated May's rights guaranteed under the Confrontation Clause.**

The cases the government relies on do not apply. Unlike the certificate in *Rainbow*, O'Neill's affidavit and spreadsheet do not indicate that she regularly prepares such reports in the administration of her work such that "an objective witness would not necessarily know that the [affidavit or spreadsheets] would be used at a later trial." 813 F.3d at 1104.

Appellate Case: 23-1890    Page: 20    Date Filed: 04/09/2024 Entry ID: 5381482

And unlike in *United States v. Melgen*, the government did not argue that the spreadsheets were admissible under Federal Rule of Evidence 1006. 967 F.3d 1250, 1260 (11th Cir. 2020). Neither did the district court rely on that rule. R. Doc. 210, at 4–5. Nor could it have since the government did not show that it had made the originals or duplicates of the "voluminous writings, records, or photographs" available for examination or copying at a reasonable time and place. FRE 1006.

The government mistakenly says that even if the district court erred in admitting the spreadsheets, the error was harmless because the information in the spreadsheets was not "essential" to the prosecution. Appellee's Br. at 46. The jury would surely be surprised to learn that the information was nonessential. The government based 11 other exhibits on the spreadsheets. (Government Exhs. 1, 2, and 3A thru 3J). And there's a reason the government made those the first 12 exhibits, and the reason was not to deemphasize them. And there's a reason the government referred to them in its closing argument. (TR., Vol. 7, p. 1459,

Appellate Case: 23-1890   Page: 21   Date Filed: 04/09/2024 Entry ID: 5381482

1464). Finally, the first page of the spreadsheet shows the total amount paid for the prescriptions (over $4.6 million), the rough basis for restitution. Add. 7. Of that amount, the government alleged that May received only $5,000. R. Doc. 59, at 38.

Moreover, we explain in greater detail in our opening brief why the error was not harmless beyond a reasonable doubt.

## IV. Because Government Exhibits 1, 2, and 3A thru 3J were based on Government Exhibits 4 and 5, they were also improperly introduced.

Government Exhibit 1 was a summary of Government Exhibit 4. (TR., Vol. 3, p. 481–82). Government Exhibits 2 and 3A thru 3J were also created from the spreadsheets. (TR., Vol. 3, p. 484, 487). Because Government Exhibits 4 and 5 were inadmissible, Government Exhibits 1, 2, and 3A thru 3J are also inadmissible. FRE 802 (hearsay inadmissible). And the error was not harmless. The exhibits were the heart of Wunderlin's testimony. (TR., Vol. 3, p. 482–90).

Appellate Case: 23-1890    Page: 22    Date Filed: 04/09/2024 Entry ID: 5381482

## V. The district court abused its discretion by not allowing May to cross-examine Clifton about his dishonesty.

The government cites no authority for the idea that a statement that appears dishonest but for which the witness may (or may not) have a valid explanation is inadmissible under FRE 608(b)(1). Note the words the district court and the government use: "not totally inconsistent," "unclear," "doubt," "messy." Undergirding all those phrases is a recognition that the statements have indicia of dishonesty. And whether statements that appear dishonest are in fact dishonest is for the jury to decide. *See United States v. Gaona-Lopez*, 408 F.3d 500, 505 (8th Cir. 2005) (finding that credibility questions are the province of the jury).

Not only that, the probable value was significant. Clifton was the only witness who could say whether May received money for signing prescriptions. Thus, Clifton's proclivity to lie was of no minor concern.[2] Moreover, "[w]here the testimony of one

---

[2] The government frames the issue as whether Clifton was "capable of lying and/or changing his story." That, the government says, "would not be new information." But if that is the test for

Appellate Case: 23-1890    Page: 23    Date Filed: 04/09/2024 Entry ID: 5381482

witness is critical to the government's case, the defendant has a right to attack that witness's credibility by a wide-ranging cross-examination." *United States v. Dennis*, 625 F.2d 782, 798 (8th Cir. 1980).

Although a district court must balance the probative value of 608(b) evidence with the risk of unfair prejudice under Rule 403, we fail to see how the government would be unfairly prejudiced by May asking Clifton about his lies. In its brief, the government insists 11 times that evidence of guilt is "overwhelming." If it the evidence was so overwhelming, then what unfair prejudice could the government have suffered? We know of none. And the government offers none.

## VI. The evidence was insufficient to convict May of conspiracy. (Count 1)

The government did not show that May joined an agreement or that he knew the purpose when he joined. As for an agreement, the government says that "proof of prescribing demon-

---

608(b) evidence, then such evidence is never admissible, for everyone is capable of lying or changing their story.

Appellate Case: 23-1890    Page: 24    Date Filed: 04/09/2024 Entry ID: 5381482

strated a conspiracy to generate prescriptions." Appellee's Br. at 48. That's too broad. Because a doctor signs prescriptions, he's guilty of conspiracy? The real question is whether the evidence was sufficient to show that May joined an agreement for him to get paid to sign prescriptions. It was not sufficient. Clifton said he talked with May in early 2015 about signing prescriptions. (TR., Vol. 5, p. 925). Clifton doesn't know whether he told May about MedwoRx, and Clifton said there never was an agreement with May: "We never talked about it." *Id.* at 925, 926, 1033. Clifton didn't tell May about reps having a script or include him in "team" e-mails. *Id.* at 1026. There simply was insufficient evidence to show that May knew of a conspiracy, that he agreed to join it, or that he knew of an unlawful objective, all of which was necessary to prove a conspiracy.

As to the purpose, the government tries to boost its argument with hollow modifiers, saying it was "obvious" the conspiracy involved kickbacks and May "doubtless" knew. As we show in the kickback section of our opening brief and here, it would

18

not have been obvious to May, and he would not have "doubt-less" known that it involved kickbacks.[3]

Finally, the government's reliance on cases where defendants fled or made false exculpatory statements is misplaced. Neither case involved a conspiracy. In *United States v. Davis*, the Court said that "an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." 867 F.3d 1021, 1030 (8th Cir. 2017) (cleaned up). That is not what we have here. And in *United States v. Chatmon*, the defendant was the lone occupant of a rental vehicle in which a firearm was found. 742 F.3d 350, 352 (8th Cir. 2014). A police officer said the defendant was driving the vehicle; the defendant said he was not. *Id.* at 353. That evidence, "[t]aken together" with other evidence, allowed the jury to infer that the defendant knew the firearm was in the vehicle. *Id.* Here, however,

---

[3] Keep in mind that the alleged payment to May didn't occur—if it occurred at all—until more than three months after this started and was only $5,000 out of over $4.6 million in prescriptions.

Appellate Case: 23-1890    Page: 26    Date Filed: 04/09/2024 Entry ID: 5381482

unlike possessing a firearm, which involves one person, conspiracy involves multiple individuals and a host of factors. Whereas concealment may be sufficient to infer guilt as to the specific part of the conspiracy that is attempted to be concealed—in this case, having signed prescriptions for patients May allegedly did not see—a jury cannot thus infer that May was aware of other parts of a conspiracy.

## VII. The evidence was insufficient to convict May of mail fraud as to Holiman. (Count 14)

The government confidently asserts that "May's kickback 'arrangement' fundamentally tainted *all* of his prescriptions" and that "May has no answer for this. Nor does he venture one." Appellee's Br. at 53. Like Mark Twain's misreported 1897 death, the government's claim that May has no answer is exaggerated. In fact, he has two. First, unless the government is prepared to admit otherwise, mail fraud and receiving kickbacks are different crimes; the government must prove both to convict of both. That's probably why the jury instruction for mail fraud as to Ho-

liman does not say, "If you find May guilty of receiving kickbacks, you must find him guilty of mail fraud." Second, as we show in our opening brief and in this reply brief, there was no kickback "arrangement." Even Clifton said so. (TR., Vol. 5, p. 926, 1033).

Turning to the actual issue—whether there was sufficient evidence for the jury to find that May intended to defraud—the government's argument is built on conjecture. It focuses only on May's interactions with Holiman rather than the whole hospital chart. Doctors review all of a patient's records when deciding treatment, not just that one doctor's experience. Those records show that Holiman was prescribed pain medicine in late December 2014 and in January 2015. (Government's Exh. 24, p. 26, 143, 349, 785). She was given acetaminophen on January 17, 18, and 20. *Id.* at 940, 954. The final one was based on May's own order. *Id.* at 953–954. When she entered the hospital in late December 2014, she was in acute pain, and staff were to administer pain medications before painful procedures. *Id.* at 372, 405. As would be expected with someone elderly and bed-bound, she was at risk

21

for impaired skin integrity. *Id.* at 1068. When she was discharged on January 5 and 27, 2015, she had a prescription for clobetasol, a skin cream, and was to apply it twice daily. *Id.* at 141, 785. And when she was admitted to the hospital in January 2015, she was already on nutritional supplements and Tylenol. (TR., Vol. 6, p. 1214, 1215); (Government's Exh. 24, p. 1852).[4] All of this makes pain creams and nutritional supplements reasonable.

As for the testimony of FBI agent Hudson that the January 27, 2015 discharge orders did not include the pain creams or nutritional supplements that May had prescribed, she did not say whether pain creams and nutritional supplements are the sorts of things that would be included in hospital discharge orders. She is not a doctor to know one way or the other. (TR., Vol. 6, p. 1208). And May was not the doctor who reviewed and signed the discharge orders to make sure they were correct. (Government's Exh. 24, p. 1051).

---

[4] The summary the government prepared, introduced into evidence, and represented as accurate omits everything we've included in this paragraph. (Government's Exh. 23).

22

Another flaw in the government's theory is that it doesn't explain hospital protocol for entering prescriptions into their system. Are prescriptions not yet at the hospital entered? Are they entered when prescribed? Or only when they arrive? The most logical explanation is that the discharge orders reflect the medicines the patient is taking upon leaving the hospital so that the next provider can have a snapshot of what the patient is receiving then. Those are legitimate explanations for why the prescriptions would not be in the hospital records. The government addresses none of them.

The government also asks the Court to assume that *all* prescriptions except those at issue were documented in Holiman's chart. But there was no evidence to that effect.

The government claims that May "knew" on January 25 that Holiman would not return to assisted living simply because he had "recommended" release to a skilled nursing facility. Appellee's Br. at 55, 57. The suggestion, we assume, is that assisted living facilities horde former patients' medicines rather than return

23

them to the pharmacy or forward them to the patient's new facility. That theory has two problems. No evidence in the record supports it, and families do not always follow doctors' recommendations. There is no evidence that May knew whether the family would accept his recommendation.

Lastly, the government says that the only actual patient of May that he wrote a prescription for was Holiman. Assuming that were true, if May was committing fraud, why would he not have written prescriptions for other TRICARE patients of his? The government has no answer. Nor does it venture one.

We end where we began: the government's case on this count is built on conjecture. Given Holiman's history of pain and use of nutritional supplements, the government did not show beyond a reasonable doubt that prescribing pain creams and nutritional supplements for Holiman evidenced an intent to defraud.

Appellate Case: 23-1890    Page: 31    Date Filed: 04/09/2024 Entry ID: 5381482

## VIII. The evidence was insufficient to convict May of receiving kickbacks. (Count 19)

The government attacks May for arguing one thing to the jury (that he did not receive money from Clifton) and arguing something else to this Court (that the evidence was insufficient that any money May have received was a kickback). That attack shows a misunderstanding of the difference between closing arguments to a jury and an argument to an appellate court.

The government next focuses on Clifton's testimony that he gave money to May. But that argument is devoid of any evidence that rebuts our point: that there was no evidence that *May* knew that any money was in exchange for signing prescriptions. Clifton did not testify that he told May that the money was for signing prescriptions or that May knew that's what it was for: May "didn't even ask for this [money], so I just gave it to him." (TR., Vol. 5, p. 963).

The government points to Clifton's "quickly" telling Dr. Pace about a business in which doctors could receive money for prescribing pain creams. (TR., Vol. 5, p. 857). But there was no

25

evidence that May overheard the conversation or that May knew of any such payments. The government also says that May tried to manipulate Pace into overstating how much they won betting in 2015: $5,000 instead of $2,600. Appellee's Br. at 60. Although Pace, after prompting by the U.S. Attorney, said that he perhaps had previously felt like May was manipulating him, Pace testified otherwise at trial: "I don't feel like he was specifically trying to manipulate." (TR., Vol. 5, p. 863).

The government cites other evidence that Clifton told his own recruiters that he, Clifton, was paying doctors. Appellee's Br. at 59. But that does not go to May's knowledge. The government also relies on a text in which Clifton joked to Hudson, "Jay already called asking this morning too … even the rich man." (Government Exh. 337). But Clifton admitted that that was a lie. (TR., Vol. 5, p. 966).

Simply put, the evidence was insufficient to show that May, if he received $5,000 from Clifton, knew that the money was in

exchange for signing prescriptions. The Court should thus reverse the kickback conviction.

## IX. The district court abused its discretion by not giving a good-faith instruction.

A good-faith instruction is required "even if the evidence supporting the claim is weak, inconsistent, or of doubtful credibility." *United States v. Casperson*, 773 F.2d 216, 223 n.12 (8th Cir. 1985). For at least two reasons, the government is mistaken that there was no evidence of May's good faith.

First, Clifton admitted that he targeted May and convinced him to sign the prescriptions, not so May could make money, but because it "was a good program to get people off of opiate drugs" and Clifton "knew that Dr. May was a proponent of getting people off of opiates." (TR., Vol. 5, p. 1009).

Second, Holiman's hospital records show that she was prescribed Tylenol for pain in late December 2014 and in early and late January 2015. (Government's Exh. 24, p. 26, 143, 349, 785). She was given acetaminophen on January 17, 18, and 20. *Id.* at

940, 954. When she came into the hospital in late December 2014, she had acute pain, and staff were to administer pain medications before painful procedures. *Id.* at 372, 405. And when she was admitted to the hospital in January 2015, she was on nutritional supplements and Tylenol. (TR., Vol. 6, p. 1214, 1215); (Government's Exh. 24, p. 1852). Given Holiman's history of pain and use of nutritional supplements, the medical records evidenced May's good faith.

The government is also wrong that other instructions adequately covered good faith or subjective intent. The instruction that May did not necessarily violate the law just because he may have violated a civil rule, regulation, professional standard, or standard of care did not address subjective intent. R. Doc. 225, at 11.

And the government's reliance on *United States v. Asomani*, 7 F.4th 749 (8th Cir. 2021), and *United States v. Brown*, 478 F.3d 926 (8th Cir. 2007), is misplaced. Both were decided before *Ruan v. United States*, the Supreme Court case that solidified the need for

28

an instruction that adequately discusses good faith and subjective intent. 142 S. Ct. 2370, 2376–79 (2022).

Furthermore, the government's attempt to distinguish *Ruan* as a narcotics case rather than a mail- or wire-fraud case is unavailing. The requirement in 21 U.S.C. § 841 (the statute in *Ruan*) for behavior that is knowing and intentional is similar to the requirement in 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud) for behavior that is voluntary and intentional. They all require subjective intent. Thus, the rationale in *Ruan* applies here as well.

## X.    The district court abused its discretion by not giving May's proposed intent-or-knowledge instruction.

The government is correct that "the jury must determine the issue of intent from all the circumstances of the case because the element of knowledge is rarely capable of direct proof." Appellee's Br. at 74 (cleaned up). It would have been fine had the jury instruction been limited to that. But the district court, at the government's urging, added words about "workings of the human mind," R. Doc. 225, at 40, what the government now claims is

29

"simply cover[ing] the same ground in greater detail." Appellee's Br. at 74. We don't know why the government thought greater detail was necessary. Or why it chose the words it did. Was it trying to get an extra edge? Was it trying to educate the jury? It doesn't matter. The effect was to add words that did little to help the jury while tipping the scales in the government's favor.

The contention that the added words, even if error, were harmless because of "overwhelming" evidence is not well-taken. Even the government and district court fretted about unfairly prejudicing the government by allowing something as simple, in their eyes, as asking Clifton about his drug-use lies. If something as "minor" as that could prejudice the government's case, then the evidence wasn't as overwhelming as the government asserts. And if that's so, then the added words were not harmless error.

## XI.  The district court abused its discretion by allowing the government to shift the burden in closing.

The government concedes that a defendant may refer in closing to a witness who does not testify if producing the witness

Appellate Case: 23-1890     Page: 37     Date Filed: 04/09/2024 Entry ID: 5381482

is solely within the government's power. Appellee's Br. at 75. Here, Justin Beach was an FBI agent who, along with Jill Hudson, interviewed May in January 2016. (TR., Vol. 6, p. 1199, 1200). Beach took notes during the interview and prepared the 302 report; Hudson did neither. *Id.* at 1197–99. The FBI did not record the interview. *Id.* at 1197. Beach did not begin to prepare the report until six days later. *Id.* at 1200. Beach also interviewed one of the patients, Raymond Lowe. *Id.* at 1285. Yet the government did not make Beach available to testify; it made Hudson available. *Id.* at 1062. And when May's counsel sought to have Beach testify, the government admitted that he had been at the trial, but balked, saying "that is not as simple as it seems" and "there is an entire process that has to be gone through, which takes quite a bit of time" and an "up and down to D.C." (TR., Vol. 4, at 650–51, 653).

Given the government's control over its own agent and its hemming and hawing to avoid producing him, it was proper for May to note in closing argument the government's failure. The

31

district court thus erred in allowing the government to fault May in rebuttal for not producing its agent.

## XII. The evidence was insufficient to convict May of aggravated identity theft. (Counts 35 and 40)

The government misreads *Dubin v. United States*, 143 S. Ct. 1557 (2023). It is not enough that a person's information be used. To convict of aggravated identity theft under 18 U.S.C. § 1028A(a)(1), the government must show a misrepresentation of *who* received the services, not *how* or *when* the services were provided. *Dubin*, 143 S. Ct. at 1574. The defendant in *Dubin* used patient identifying information to overbill Medicaid for testing. *Id.* at 1563. He overstated the test-performing employee's qualifications, thus inflating the reimbursement, and changed the date on which an examination occurred. *Id.* The lower courts found that that was identity theft, because the defendant had inflated "the price of service or good [he] actually provided." *Id.* The Supreme Court reversed: "the crux of [the defendant's] overbilling was inflating the value of services actually provided, while the patient's

means of identification was an ancillary part of the Medicaid billing process." *Id.*

Similarly, the government accused May of signing prescriptions for patients who would actually receive the prescriptions. And as even Clifton admitted, he targeted May and convinced him to sign the prescriptions, not so May could make money, but because it "was a good program to get people off of opiate drugs" and Clifton "knew that Dr. May was a proponent of getting people off of opiates." (TR., Vol. 5, at 1009). Thus, because the patients here—Hegyes and Patterson—would actually receive the prescriptions, there was no misrepresentation of *who* would receive the services. This Court should thus reverse the two counts of aggravated identity theft and reduce the sentence by two years.

The cases the government cites do not support its position; they support May. In *United States v. Gladden*, one defendant, Linton, represented that she was filling prescriptions for patients, but she was having the products sent to a third party. 78 F.4th 1232,

1245 (11th Cir. 2023). "Because the deception centered on the identity of the individual receiving the product, Linton committed identity theft." *Id.* That is not the case here: the products were sent to the patients.

Linton also used a physician's signature to order medicines the physician had not prescribed. *Id.* That, too, satisfied *Dubin*, because the deception centered on the identity of who was prescribing the medicine. There is no issue here about who prescribed the medicine.

Another defendant in *Gladden*, Gladden himself, was also convicted of identity theft. His case is more like May's. The prescription was not medically necessary and was obtained used a prefilled prescription. Thus, "[t]he deception at the heart of [the] conduct, then, was obtaining the medically unnecessary prescriptions." *Id.* at 1248. Moreover, "[t]he use of [the patient's] identifying information was merely ancillary to the deception, indeed, *at no point did [the defendant or the patient's mother] misrepresent who received the prescriptions*." *Id.* (emphasis added). The Eleventh Circuit thus

vacated Gladden's aggravated-identity-theft conviction. *Id.* at 1249. The facts here are similar to Gladden's. At no point did May misrepresent who would receive the prescriptions.

The other case the government cites is no more helpful to its cause. The defendant in *United States v. O'Lear* forged the names of a physician and an x-ray technician to make it look like those individuals had ordered or conducted the x-rays he billed for. 90 F.4th 519, 533 (6th Cir. 2024). Because the defendant had misrepresented *who* had received the services and *who* had ordered or conducted the x-rays, it fell with the statute and *Dubin*. Here, however, May did not misrepresent *who* the prescriptions were for—they were for the people whose names appeared on the prescription.

As to Patterson, the government relies on a record that May allegedly created *after* the medicines were delivered in a coverup attempt. Appellee's Br. at 63. But the government did not contend below that the chart was part of identity theft. *See, e.g.*, R.

Doc. 225, at 15. Nor could it have since the record was created after the alleged theft had occurred.

Last, the sentencing package doctrine does not apply. The doctrine's purpose is to allow a district court to reconsider the sentence to ensure that it still satisfies the factors in 18 U.S.C. § 3553(a). *Smith v. United States*, 930 F.3d 978, 981 (8th Cir. 2019). Unlike the statute at issue in *United States v. Dennis*, 81 F.4th 764 (8th Cir. 2023), the aggravated-identity-theft statute requires the district court to impose a two-year sentence *after* deciding the sentence for other crimes. 18 U.S.C. § 1028A(a)(1), (b)(2). When sentencing for the underlying crimes, the district court cannot "reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section." 18 U.S.C. § 1028A(b)(3). In other words, the district court could not and did not consider the mandatory two-year sentence when sentencing May for the other crimes. The sentencing package doctrine thus does not apply. So, if the Court reverses and vacates

the convictions for aggravated-identity-theft, it should reduce May's sentence by two years.

## Conclusion

For insufficient evidence, the Court should reverse the convictions for violating the anti-kickback statute, conspiracy, mail fraud as to Holiman, and aggravated identity theft.

The Court should reverse the other convictions because of the documents and spreadsheets that were improperly introduced through Lackey, Cialone, and O'Neill.[5] In all three instances, the exhibits were improperly authenticated, did not qualify for the business-records exception to the hearsay rule, and violated May's right to confront the witnesses against him.

The Court should also reverse because the good-faith instruction did not require subjective intent, because the knowledge-or-intent instruction tipped the scales in the govern-

---

[5] The government says that May on appeal does not challenge all the convictions. That's not true. In his opening brief, May included the same sentence that this footnote is at the end of urging the Court to reverse all of his convictions.

Appellate Case: 23-1890     Page: 44     Date Filed: 04/09/2024 Entry ID: 5381482

ment's favor, and because the district court allowed the government to shift the burden in closing arguments.

Respectfully submitted,

Brett D. Watson
Brett D. Watson, Attorney at Law, PLLC
P.O. Box 707
Searcy, Arkansas 72145-0707
(501) 281-2468
watson@bdwpllc.com

By: /s/ Brett D. Watson
Brett D. Watson
Ark. Bar No. 2002182

Appellate Case: 23-1890   Page: 45   Date Filed: 04/09/2024 Entry ID: 5381482

## Certificate of Service

I hereby certify that on April 8, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Brett D. Watson</u>
Brett D. Watson

Appellate Case: 23-1890    Page: 46    Date Filed: 04/09/2024 Entry ID: 5381482

## Certificate of Compliance

I hereby certify that the above and foregoing Appellant's Brief has been prepared with Garamond font, size 15.5, using Microsoft Word 2019 word-processing software. The brief contains 6,201 words of text, as calculated by the word-processing program. I further certify that the brief has been scanned for viruses and is virus-free.

___/s/ Brett D. Watson_____
Brett D. Watson
